IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LYDELL MARVIN BEGAY, individually and
for and on behalf of LATTISSIA BEGAY,
a minor, and natural born daughter of
LYDELL MARVIN BEGAY, MARTIN
("MARTY") BEGAY, individually, and
LORENE BEGAY, individually,

     Plaintiffs,

v.                Case No.  1:15-cv-500

MEDICUS HEALTHCARE SOLUTIONS,
LLC,

     Defendant.

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**COME NOW** Plaintiffs in the above-entitled and numbered cause of action, by and through their attorneys, the Branch Law Firm and Cohen & Zedalis LLP, and for their Complaint for Damages, state as follows:

### Nature of the Case

1. This action arises out of the shockingly poor medical care and treatment that Defendant Medicus Healthcare Solutions, LLC and its physician, Annicol Marrocco, M.D., provided to 18-year-old Lydell Marvin Begay ("Lydell Begay") at Northern Navajo Medical Center ("NNMC") in Shiprock, New Mexico, in March 2014.  Dr. Marrocco's poor care ultimately caused Lydell Begay severe and permanent disabilities: paralysis of the arms and legs, the loss of the ability to speak, and brain damage—an overall condition known as "locked-in syndrome," meaning Lydell Begay is, for the most part, permanently imprisoned in his own

1

body, unable to interact with the world around him. At the time of the injury, Dr. Marrocco was, on information and belief, a physician purportedly screened, interviewed, vetted, recommended, placed and paid at NNMC by Defendant, who oversaw and managed the terms and conditions of her employment.

2. Lydell Begay, an enrolled member of the Navajo Nation, visited the emergency room at NNMC on March 6, 2014, complaining of dizziness, severe headaches, left-sided weakness, unsteadiness, and blurred vision. Although Lydell Begay's symptoms should have immediately raised concerns regarding potentially serious neurological problems, Defendant's physician, Dr. Marrocco, examined Mr. Begay and diagnosed him as having conjunctivitis—more commonly known as "pink eye"—and instructed him to go home, take ibuprofen, and rest. Defendant's physician, Dr. Marrocco, did not request or give a neurological consultation for Lydell Begay. She failed to note the presence or possibility of any neurological issues at all. A little over a week later, after another emergency room visit to NNMC and transfer to the University of New Mexico Hospital, Lydell Begay suffered bilateral pontine infarcts—or areas of brain death—that resulted in paralysis, the need for intubation and respiratory support, and loss of speech.

3. At the time Defendant's physician, Dr. Marrocco, treated Lydell Begay, she was not licensed to practice medicine in New Mexico and was acting under restricted medical licenses from three other states. In fact, on November 12, 2013, just four months before she treated Lydell Begay, an Administrative Law Judge with the Drug Enforcement Administration (the "DEA") recommended that Dr. Marrocco's DEA registration be revoked on the grounds that her continued registration would be inconsistent with the public interest. The recommendation

of the DEA's Administrative Law Judge was later affirmed by the United States Department of Justice on May 4, 2015. *See* http://federalregister.gov/a/2015-12035.

4. Lydell Begay's catastrophic injuries resulted directly from Defendant's negligence in providing an unqualified, unlicensed and reckless physician to treat members of the Navajo Nation at NNMC. Defendant's conduct was in breach of its express promises and representations about the quality of the physicians it provides and the care it uses to select and vet those physicians. In addition, Defendant is vicariously liable for the negligence of the physician, Dr. Annicol Marrocco, whom it recruited, screened, placed, transported, housed, and paid to provide care to Lydell Begay. Defendant's liability extends to the relational losses suffered by Lydell Begay's parents and daughter as a result of the severity of his injuries.

## The Parties

5. Plaintiff Lydell Begay is, at all times material to this action, a resident of Fruitland, County of San Juan, State of New Mexico.

6. Lydell Begay also brings a claim in this action for and on behalf of Lattissia Begay, a minor, and Lydell Begay's natural born daughter.

7. Plaintiffs Martin ("Marty") Begay and Lorene Begay each individually bring claims in this action in their individual capacities as Lydell Begay's natural father and mother, respectively.

8. Defendant Medicus Healthcare Solutions, LLC is, on information and belief, a privately held limited liability corporation with headquarters in New Hampshire and offices in New Hampshire and Denver, Colorado. Defendant is a registered government contractor providing "locum tenens" (or temporary, fill-in) physicians and transition staffing for, among other federal facilities, the Indian Health Services, which oversees and manages NNMC.

9.  At all times material herein, Dr. Marrocco was acting as an employee and/or apparent, ostensible, or actual agent of Defendant in that Defendant oversaw and managed the terms and conditions of her employment at NNMC.

### Jurisdiction and Venue

10.  This Federal District Court is vested with subject matter jurisdiction over this action based on diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds the sum of $75,000.00.

11.  Venue is properly in this District pursuant to 28 U.S.C. § 1402(b) because Plaintiff resides in the State of New Mexico and the acts complained of herein occurred in the State of New Mexico.

### Statement of Facts

*Defendant's Promised Services*

12.  On information and belief, since approximately August 2012, Defendant screened, interviewed, vetted, recommended, and placed Dr. Marrocco as an emergency room physician at NNMC. According to Defendant's website, www.medicushcs.com, Defendant: (i) is "laser focused on **quality**;" (ii) "constantly ensure[s] that [it is] producing quality solutions that meet [a healthcare facility's] particular goals;" and (iii) believes "**accountability** is the key to creating long-term partnerships with our key stakeholders, providers, and clients." (Emphasis in original.)

13.  Defendant also promises, on its website, that it "will ensure that [its healthcare facility clients] have the **high-quality** medical staff [they] need" in order to provide healthcare services to patients. *See* www.medicushcs.com (emphasis added.)

4

14. Defendant further promises to its clients that it will place physicians who have an unrestricted medical license in at least one of the 50 states and that it will perform a thorough background check and investigation on all its physicians. In particular, Defendant represents that it "maintain(s) a deep understanding of government specific credentialing and background investigation processes." *See* www.medicushcs.com/specialties/government

15. Healthcare facilities like NNMC that are interested in obtaining temporary physicians from Defendant place an "order" to Defendant within minimum (*i.e.*, two weeks for travelers, 8-hour shifts for *per diem* work) and maximum ($1,000,000 per order) guidelines set exclusively by Defendant. Defendant also controls the hourly price for each physician ordered and provides malpractice insurance for those physicians.

16. Defendant screens, places, credentials, transports, houses and pays physicians like Dr. Marrocco, while profiting off of payments for those doctors' services by receiving payment for those services directly from the government. As Defendant describes on its web site, in placing its physicians, like Dr. Marrocco, at a facility like NNMC, Defendant, among other tasks:

    (a)    will "coordinate and cover all rental car, housing, and flight arrangements for [the physician] and take into account any preferences…that [the physician] may have;"

    (b)    will "relieve [the physician] of the hassle often associated with the credentialing process…[Defendant's] team of specialists will coordinate, as well as, expedite the credentialing process for [the physician]"; and

    (c)    "facilitat[e] any and all administrative processes to help keep your licenses up-to-date."

*See* http://www.medicushcs.com/services-for-our-providers

### Dr. Annicol Marrocco's Alarming History

17. At the time Defendant screened, interviewed, vetted, recommended, and placed Dr. Marrocco as an emergency room physician at NMMC, Dr. Marrocco was not licensed to practice medicine in the State of New Mexico and was censured, disciplined, and fined by the medical boards of Florida, Pennsylvania, and New York. In addition, her medical licenses in those states were restricted, in violation of Defendant's own promises, internal guidelines, and practices and procedures.

18. During the time that Dr. Marrocco was employed at NNMC, the Deputy Assistant Administrator, Office of Division Control for the DEA, issued a Show Cause Order dated May 13, 2013, which alleged the following, among other things:

    (a) Between January 2008 and August 2009, Dr. Marrocco issued approximately 21 prescriptions for oxycodone, a schedule II controlled substance, "outside the usual course of professional practice and for other than a legitimate medical purpose";

    (b) Dr. Marrocco failed to maintain medical records supporting the prescriptions, in violation of Florida law; that she was in a personal relationship with the person to whom she prescribed the drugs; and did not examine that person except to listen to his heart and lungs;

    (c) Dr. Marrocco had violated DEA regulations that, while allowing a practitioner to issue multiple prescriptions for a schedule II controlled substance, limit the quantity of the prescriptions to a 90-day supply,

    require that a prescription include the earliest date on which it can be filled, and require that each prescription be issued for a legitimate medical purpose;

  (d) Dr. Marrocco knowingly and willfully violated federal law on at least 49 occasion by issuing controlled substance prescriptions while practicing at NNMC; and

  (e) Dr. Marrocco knowingly and willfully violated federal law by issuing controlled substance prescriptions in one state (New Mexico) under a DEA registration issued for another state (New York).

19. Further, during the time that Dr. Marrocco was employed at NNMC, an Administrative Law Judge, in a Recommended Decision issued on November 12, 2013, found that:

  (a) the DEA had established a prima facie case that Dr. Marrocco's continued registration would be inconsistent with the public interest;

  (b) Dr. Marrocco had failed to rebut the DEA's showing;

  (c) Dr. Marrocco had a "history of substantial and material disciplinary action taken by the medical licensing boards of three states";

  (d) Dr. Marrocco's testimony before the Administrative Law Judge lacked candor; and

  (e) Dr. Marrocco's DEA registration should be revoked.

20. The publically available state disciplinary orders sanctioning Dr. Marrocco in Florida, New York and Pennsylvania predated Defendant's original background check, as well as its vetting and screening of Dr. Marrocco prior to her original placement at NNMC. Both the

DEA's Order to Show Cause and the subsequent ALJ findings and recommendations were issued in 2013, prior to the term of Defendant's one-year 2014 contract with NNMC providing Dr. Marrocco to that facility as an emergency room physician.

21.   Both parties appealed the November 12, 2013 Recommended Decision of the Administrative Law Judge, and on May 4, 2015, the United States Department of Justice issued its Decision and Order affirming the revocation of Dr. Marrocco's DEA registration.  *See* http://federalregister.gov/a/2015-12035.  In the Decision and Order, the United States found the following, among other things:

   (a)   While Dr. Marrocco holds an active license in New York, Florida, and Pennsylvania, she has been disciplined by the medical boards of each of these States based on her prescribing of controlled substances to an individual with whom she had a personal relationship while she was practicing in Florida;

   (b)   In February 2008, Dr. Marrocco wrote three undated prescriptions for 149 days' supply of OxyContin for an individual with whom she had a personal relationship in violation of federal law;

   (c)   In March 2008, Dr. Marrocco again wrote three more undated prescriptions for oxycodone for the same individual.  According to Dr. Marrocco's testimony, she wrote the three oxycodone prescriptions that were filled on March 10, 2010 because she "was told the prescriptions were either lost or destroyed by the animals in the house, by the monkey … he would take the pill bottle, open it, and throw it in the pool . . . ."

(d) Throughout 2008 Dr. Marrocco continued to prescribe oxycodone to that individual even though he was in Los Angeles pursuing an acting career, and between February and March 2009, the prescriptions Dr. Marrocco wrote authorized the dispensing of 990 tablets of oxycodone; and

(e) Dr. Marrocco's testimony that "she wrote the multiple oxycodone 30 mg prescriptions because she actually believed [her friend's] claim that the monkey had taken the pill bottle, managed to open it, and then threw the medication in the pool" was not "credible" and "substantial evidence supports a finding that [Dr. Marrocco] lacked candor when she testified in this proceeding."

***The Substandard Care Provided by Defendant's Physician, Dr. Marrocco***

22. On March 6, 2014, Lydell Begay presented to the emergency room of NNMC complaining of dizziness, left-sided weakness, severe headaches, unsteadiness, and blurred vision. He was seen by Defendant's physician, Dr. Marrocco.

23. Dr. Marrocco failed to conduct any tests, scans, or use other diagnostic tools on Lydell Begay. Instead, she told Lydell Begay to go home and rest, take ibuprofen, and wrote him a prescription for eye drops. The medical records reflect that Dr. Marrocco's discharge diagnosis of Lydell Begay's was "conjunctivitis."

24. Following his discharge, Lydell Begay subsequently presented again at NNMC's emergency room on March 13, 2014, complaining of the same or similar symptoms, and radiographic imaging conducted that day indicated the presence of a blood clot in the basal ganglia of Lydell Begay's head and neck area.

9

25.  Some time after reviewing Lydell Begay's CT scan, NNMC arranged for Lydell Begay to be transferred to the University of New Mexico Hospital ("UNMH").

26.  On information and belief, following his admission to UNMH, Lydell Begay was diagnosed with left posterior cerebral artery, left posterior inferior cerebral artery, and left acute focal cerebral arteriopathy infraction, and there was an abnormal signal within the intradural left vertebral artery.  The presumptive diagnosis was made at UNMH of left cervical vertebral artery dissection, and within the next 36 hours Lydell Begay had further propagation of his stroke, ultimately causing bilateral pontine infarcts leading to complete quadriparesis, the need for intubation and respiratory support, and the loss of speech.

## FIRST CAUSE OF ACTION:  MEDICAL NEGLIGENCE

### (Vicarious Liability For the Negligence of Its Employee and/or Agent)

27.  Plaintiff incorporates herein all of the foregoing allegations as though set forth in their entirety.

28.  In undertaking the care, treatment, and diagnosis of Lydell Begay, Defendant, through its employee, agent, or apparent agent, Dr. Marrocco, was under a duty to possess and apply the knowledge and to use the skill and care that is used by reasonably well-qualified healthcare providers in the same or similar circumstances.

29.  Defendant breached its duty of care to Lydell Begay and was negligent in the management of Lydell Begay's health and safety.  Defendant's negligence, errors, acts, and omissions include but are not limited to:

    a. Failing to properly diagnose Lydell Begay's condition and instead treating him for an eye infection;

  b. Failing to properly refer Lydell Begay to a neurologist and/or neurological services capable of treating such an illness;

  c. Failing to hospitalize and/or transfer Lydell Begay to a higher level of care in a timely and expeditious manner;

  d. Failing to perform and/or order diagnostic tests and/or provide treatment relevant to Lydell Begay's condition; and

  e. Failing to timely diagnose and treat Lydell Begay.

30. Defendant's physician, Dr. Marrocco, had an express and/or implied duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified physicians practicing under the same or similar circumstances.

31. Defendant breached its duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified health care providers practicing under the same or similar circumstances.

32. As a direct and foreseeable result of Defendant's negligent conduct, Plaintiff has suffered the injuries and damages described herein.

33. As a further direct and proximate cause of Defendant's negligent conduct, Plaintiff has incurred, and continues to incur, medical and related expenses all in an amount not presently determinable but to be proven at the time of trial.

34. As a further direct and proximate cause of Defendant's negligent conduct, Plaintiff has sustained a loss of wages and other benefits and will continue to suffer a loss of wages and other benefits in the future, and has lost the ability to provide domestic services to himself and his family, all in an amount not presently determinable but to be proven at the time of trial.

35. As a further direct and proximate result of Defendant's negligent conduct, Plaintiff has suffered, and will continue to suffer, severe physical, mental, and emotional pain, suffering and anguish, all in an amount not presently determinable but to be proven at the time of trial.

36. As a further direct and proximate result of Defendant's negligent conduct, Plaintiff has suffered a loss of the value of the enjoyment of life and will continue to suffer a loss of the value of enjoyment of life in the future, all in an amount not presently determinable but to be proven at the time of trial.

37. The acts and omissions of Defendant through their agents, employees, representatives, officers, directors and/or designees, which were a direct and proximate cause of the injuries and damages suffered by Plaintiff, were committed with utter and total disregard of the rights of Plaintiff, and/or were willful, malicious, wanton, reckless and/or in bad faith, thus entitling Plaintiff to an award of punitive damages in an amount to be determined by the trier of fact in order to punish Defendant and deter others from similar conduct.

38. The negligent acts and omissions of Defendant as set forth above were committed by Defendant through its employees, agents, representatives, officers, directors and/or designees, and/or were ratified and/or acquiesced to by Defendant through its agents, employees, representatives, officers, directors and/or designees while serving in a managerial capacity.

## SECOND CAUSE OF ACTION:  NEGLIGENCE

### (Direct Liability)

39. Plaintiffs incorporates herein all of the foregoing allegations as though set forth in their entirety.

40. Defendant had express and/or implied duties to provide well-qualified physicians with unrestricted medical licenses to render care and treatment to patients at hospitals requiring temporary staffing support, including NNMC.

41. Defendant owed Lydell Begay an express or implied duty of care to provide well-qualified physicians at NNMC, and it breached its duty of care to Lydell Begay by placing Dr. Marrocco as an emergency room physician at NNMC and continuing to employ her services at NNMC even though (i) she had been disciplined by the medical boards of Florida, New York, and Pennsylvania; (ii) was not practicing medicine at NNMC with an unrestricted medical license; (iii) her DEA registration was suspended and subject to revocation; (iv) she lacked the ability to properly perform her functions as a physician providing emergency medical services to patients at NNMC, including Lydell Begay; and (v) had practiced medicine in a reckless and illegal manner that made it foreseeable that she would cause harm and injury to patients at NNMC, including Lydell Begay.

42. As a direct and foreseeable result of Defendant's negligent conduct, Lydell Begay has suffered the injuries and damages described herein.

43. As a further direct and proximate cause of Defendant's negligent conduct, Lydell Begay has incurred, and continues to incur, medical and related expenses all in an amount not presently determinable but to be proven at the time of trial.

44. As a further direct and proximate cause of Defendant's negligent conduct, Lydell Begay has sustained a loss of wages and other benefits and will continue to suffer a loss of wages and other benefits in the future, and has lost the ability to provide domestic services to himself and his family, all in an amount not presently determinable but to be proven at the time of trial.

45. As a further direct and proximate result of Defendant's negligent conduct, Lydell Begay has suffered, and will continue to suffer, severe physical, mental, and emotional pain, suffering and anguish, all in an amount not presently determinable but to be proven at the time of trial.

46. As a further direct and proximate result of Defendant's negligent conduct, Lydell Begay has suffered a loss of the value of the enjoyment of life and will continue to suffer a loss of the value of enjoyment of life in the future, all in an amount not presently determinable but to be proven at the time of trial.

47. The acts and omissions of Defendant through its agents, employees, representatives, officers, directors and/or designees, which were a direct and proximate cause of the injuries and damages suffered by Lydell Begay, were committed with utter and total disregard of the rights of Lydell Begay, and/or were willful, malicious, wanton, reckless and/or in bad faith, thus entitling Lydell Begay to an award of punitive damages in an amount to be determined by the trier of fact in order to punish Defendant and deter others from similar conduct.

48. The negligent acts and omissions of Defendant as set forth above were committed by Defendant through its employees, agents, representatives, officers, directors and/or designees, and/or were ratified and/or acquiesced to by Defendant through its agents, employees, representatives, officers, directors and/or designees while serving in a managerial capacity.

### THIRD CAUSE OF ACTION:  BREACH OF CONTRACT
**(Third Party Beneficiary)**

49. Plaintiffs incorporate herein all of the foregoing allegations as though set forth in their entirety.

50. In failing to adequately screen, interview, vet, recommend, and place Dr. Marrocco—an unqualified and potentially dangerous physician—at the emergency room at NNMC, Defendant breached its contractual promises to NNMC, including its promises to: (i) provide thorough background investigation and research with respect to its physicians; (ii) provide "high quality" physicians to its clients; (iii) ensure that its physicians had adequate credentials and licenses

51. Contrary to and in breach of its contractual obligations to NNMC, Defendant provided an unqualified, low quality, unlicensed, insufficiently credentialed, physician with a history of dishonest, reckless and illegal conduct.

52. As a Navajo patient of NNMC, Lydell Begay was expressly or impliedly the intended beneficiary of Defendant's promises to NNMC to provide, *inter alia*, adequately screened, "high quality" physicians to the NNMC.

53. As a direct and foreseeable result of Defendant's breaches, Plaintiff has suffered the injuries and damages described herein.

54. As a further direct and proximate cause of Defendant's breaches, Plaintiff has incurred, and continues to incur, medical and related expenses all in an amount not presently determinable but to be proven at the time of trial.

55. As a further direct and proximate cause of Defendant's breaches, Plaintiff has sustained a loss of wages and other benefits and will continue to suffer a loss of wages and other benefits in the future, and has lost the ability to provide domestic services to himself and his family, all in an amount not presently determinable but to be proven at the time of trial.

56. As a further direct and proximate result of Defendant's breaches, Plaintiff has suffered, and will continue to suffer, severe physical, mental, and emotional pain, suffering and anguish, all in an amount not presently determinable but to be proven at the time of trial.

57. As a further direct and proximate result of Defendant's breaches, Plaintiff has suffered a loss of the value of the enjoyment of life and will continue to suffer a loss of the value of enjoyment of life in the future, all in an amount not presently determinable but will be proven at the time of trial.

58. The acts and omissions of Defendant through its agents, employees, representatives, officers, directors and/or designees, which were a direct and proximate cause of the injuries and damages suffered by Lydell Begay, were committed with utter and total disregard of the rights of Lydell Begay, and/or were willful, malicious, wanton, reckless and/or in bad faith, thus entitling Lydell Begay to an award of punitive damages in an amount to be determined by the trier of fact in order to punish Defendant and deter others from similar conduct.

59. The breaches by Defendant as set forth above were committed by Defendant through its employees, agents, representatives, officers, directors and/or designees, and/or were ratified and/or acquiesced to by Defendant through its agents, employees, representatives, officers, directors and/or designees while serving in a managerial capacity.

### FOURTH CAUSE OF ACTION: VIOLATION OF NEW MEXICO'S UNFAIR PRACTICES ACT

60. Plaintiffs incorporate herein all of the foregoing allegations as though set forth in their entirety.

61. At all times material herein, Defendant was a person as defined by the NMUPA, NMSA 1978, Section 57-12-2(A), engaged in trade or commerce as defined by NMSA 1978, Section 57-12-2(B).

62. Defendant's publicly-disseminated advertising and website information promising to the public that physicians it places, provides, and/or employs at hospitals such as NNMC have been properly interviewed, screened, and vetted prior to placement, and that such physicians, such as Dr. Marrocco, were "high quality" and practices under unrestrictive licenses, were false, deceptive, and misleading with respect to the qualifications of Dr. Marrocco.

63. Defendant's placement, provision, or employment of Dr. Marrocco at NNMC who is not a qualified, "high quality" physician with an unrestricted medical license is an unfair or deceptive trade practice as defined by NMSA 1978, Section 57-12-2(D)(2), (3), (5), (7), and (17) and, accordingly, constitutes a violation of the New Mexico Unfair Practices Act, NMSA 1978, Section 57-12-1, *et seq.* (the "NMUPA").

64. As a direct and foreseeable result of Defendant's violation of the NMUPA, Plaintiff has suffered the injuries and damages described herein.

65. As a further direct and proximate cause of Defendant's violation of the NMUPA, Plaintiff has incurred, and continues to incur, medical and related expenses all in an amount not presently determinable but to be proven at the time of trial.

66. As a further direct and proximate cause of Defendant's violation of the NMUPA, Plaintiff has sustained a loss of wages and other benefits and will continue to suffer a loss of wages and other benefits in the future, and has lost the ability to provide domestic services to himself and his family, all in an amount not presently determinable but to be proven at the time of trial.

67. As a further direct and proximate result of Defendant's violation of the NMUPA, Plaintiff has suffered, and will continue to suffer, severe physical, mental, and emotional pain, suffering and anguish, all in an amount not presently determinable but to be proven at the time of trial.

68. As a further direct and proximate result of Defendant's violation of the NMUPA, Plaintiff has suffered a loss of the value of the enjoyment of life and will continue to suffer a loss of the value of enjoyment of life in the future, all in an amount not presently determinable but will be proven at the time of trial.

69. Defendant has willfully engaged in the unfair and deceptive trade practices described above, and, as such, Plaintiff is entitled to recover additional damages in an amount up to three (3) times his actual damages.

70. It has become necessary for Plaintiff to employ an attorney for purposes of representing him herein and, therefore, he is entitled to recover his attorneys' fees and reasonable costs.

71. The deceptive and unfair acts of Defendant as set forth above were committed by Defendant through its employees, agents, representatives, officers, directors and/or designees, and/or were ratified and/or acquiesced to by Defendant through its agents, employees, representatives, officers, directors and/or designees while serving in a managerial capacity.

### FIFTH CAUSE OF ACTION: LOSS OF CONSORTIUM

**(Asserted by Plaintiffs Martin ("Marty") Begay and Lorene Begay, individually, and Lattissia Begay, a minor child, by and through Lydell Begay, her natural father)**

72. Plaintiffs incorporate herein all of the foregoing allegations as though set forth in their entirety.

73. It was foreseeable that Lydell Begay's parents, Plaintiffs Martin ("Marty") Begay and Lorene Begay, and his daughter, LattissiaBegay, would suffer loss of society, companionship and/or guidance as a result of the severe bodily injuries that Defendant's negligence and/or breaches caused.

74. Plaintiffs Marty ("Marty") and Lorene Begay, natural parents of Lydell Begay, were close familial care-takers, who lived with and cared for Lydell Begay prior to the injury.

75. Plaintiff Leticia Begay, born in September 2013, is Lydell Begay's natural born daughter and lived with and was cared for by Lydell Begay prior to the injury.

76. As a direct and proximate result of the negligence and/or breaches of Defendant, Plaintiffs Martin ("Marty") and Lorene Begay, and Lattissia Begay, suffered a loss of society, companionship, guidance, comfort, aid and protection.

77. Plaintiffs Martin ("Marty") and Lorene Begay, and Lattissia Begay suffered severe emotional injury as a result of the loss of Lydell Begay's society, companionship, guidance, comfort, aid and protection.

78. As a direct and proximate result of Defendant's negligence and/or breaches, Plaintiffs Martin ("Marty") and Lorene Begay, and Lattissia Begay of suffered and will continue to suffer a loss not presently determinable, but to be proven at the time of trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter final judgment in favor of Plaintiffs and against Defendant in an amount to be proven at the time of trial for all of Plaintiffs' damages including, but not limited to compensatory damages; past and future medical costs and related expenses; hedonic damages; damages associated with the loss of society, companionship, guidance, comfort, aid and protection; punitive damages; as well as costs associated with

bringing this cause of action; for reasonable attorney's fees as allowed by law; for pre-judgment interest and post-judgment interest; and for such other further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to *Fed. R. Civ. P.* 38, Plaintiffs hereby demand a trial by jury.

Dated:  June 12, 2015.                                    Respectfully submitted,

BRANCH LAW FIRM

By _____
Turner W. Branch
Margaret M. Branch
2025 Rio Grande Blvd., NW
Albuquerque, NM 87104
(505) 243-3500 - Telephone
(505) 243-3534 - Facsimile
twb@branchlawfirm.com
mmb@branchlawfirm.com

*and*

COHEN & ZEDALIS LLP
Seth T. Cohen
Cynthia L. Zedalis
128 Grant Ave.
Santa Fe, New Mexico  87501
(505) 795-7699 - Telephone
(505) 395-7540 - Facsimile
scohen@candzlaw.com
czedalis@candzlaw.com

***Attorneys for Plaintiff***